## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:

EDG HOLDINGS, INC.
UNITED SCIENCE INDUSTRIES, INC.

        Debtor(s).

UNITED SCIENCE INDUSTRIES,
as Debtor-in-Possession


        Plaintiff(s),

  v.

SOUTHWEST BANK, AN M & I BANK
BANTERRA BANK; and ENVIROCAP, LLC

        Defendant(s).

In Proceedings
Under Chapter 11
(Jointly Administered)

Case No. 09-41525


Adv. No. 09-4101

### <u>OPINION</u>

Plaintiff/Debtor United Science Industries (USI)  filed a five-count Second Amended Complaint which, essentially, seeks to invalidate liens being claimed by defendants Southwest Bank, an M & I Bank (Southwest), EnviroCap, LLC (EnviroCap) and Banterra Bank (Banterra) in certain government reimbursement payments. The plaintiff and each of the defendants moved for summary judgment on the complaint.[1]

---

[1]It should be noted that initially, each of the defendants had moved to dismiss the Second Amended Complaint and, to date, no answers have been filed.  However, at hearing on April 20, 2010, rather than granting the requested relief and necessitating the filing of yet another amended complaint, the parties agreed to a proposed stipulation of facts and have moved for summary judgment based on those facts.

## FACTS

Prior to bankruptcy, plaintiff USI was in the business of providing environmental remediation services, including remediation of leaking underground storage tanks.  In order to facilitate the clean-up of property contaminated by leaking underground storage tanks, the State of Illinois, through the Office of the State Fire Marshal and the Illinois Environmental Protection Agency (IEPA) implemented the Leaking Underground Storage Tank Program.  415 ILCS 5/57 *et. seq.*  In addition to providing comprehensive procedures for property remediation, the program also establishes and maintains a State-administered fund, referred to as the LUST Fund, to help property owners offset the substantial costs of environmental cleanup.  Typically, in providing its remediation services, USI entered into a "Contract for Services" with the property owner (hereinafter "customer"), whereby the customer was obligated to pay USI for its labor, materials, reports, and services.  However, because many customers lacked the financial resources to pay the cleanup costs in advance, USI's standard service contract was often modified by an Amended Payment Agreement, along with an Assignment of Right to Reimbursement and a Limited Power of Attorney, whereby the customer assigned its right to reimbursement from the LUST Fund to USI.  Pursuant to the Amended Payment Agreement, payment for USI's services was due when the reimbursement from the LUST Fund was received.

In order to finance its operations, USI entered into a series of loans with defendants Southwest and Banterra. *Amended Joint Stipulation, ¶¶* 3 and 6.  Pursuant to these agreements, the defendants took security interests in many forms of collateral, including USI's accounts, accounts receivable, rights to payment, contract rights, general intangibles, and proceeds.[2]

---

[2] Defendant Banterra made loans to USI both separately and with defendant Southwest. Banterra's Motion for Summary Judgment is directed only to the *separate* loans to the debtor secured by the debtor's

Similarly, USI entered into a "Factoring and Security Agreement" with defendant EnviroCap, under which EnviroCap periodically "purchased" the debtor's rights to payment from the LUST Fund.  Pursuant to the parties' agreement, USI assigned the purchased claims to EnviroCap and USI warranted that EnviroCap would have a first priority security interest in those purchased claims.[3] *See* Factoring and Security Agreement, Plaintiff's Group Exhibit C, at Article XIII).  It is undisputed that each of the defendants filed UCC-1 financing statements in connection with their loan agreements. *Amended Joint Stipulation* ¶ 7, Plaintiff's Group Exhibits F, G and H.

On September 21, 2009, USI filed its petition under Chapter 11 of the Bankruptcy Code. At the time that the petition was filed, USI's contracts with its customers were in various stages of completion.  Administratively USI classifies its contracts, based on the extent of completion, as Stage I, Stage II or Stage III receivables (the "USI Receivables."). "Stage I" refers to claims where work has been performed, but for which either invoices have not yet been submitted to the IEPA or which have been rejected by the IEPA subject to resubmission. "Stage II" includes submitted claims which have neither been approved nor rejected by the IEPA.  Finally, "Stage III" is comprised of those claims which have been approved by the IEPA but which have not yet been paid. *Amended Joint Stipulation* ¶ 8.  At present, certain funds are due and owing or will be due and owing from the LUST Fund to either USI or its customers for remediation services performed by USI.  Each of the defendants asserts a security interest in the LUST Fund

---

general intangibles. In its motion, Banterra concedes that Southwest has a priority perfected lien as to the debtor's "accounts."  *See Banterra Bank's Combined Motion and Memorandum for Summary Judgment on Debtor's Second Amended Complaint* at ¶ 2.

[3] There is a dispute between USI and EnviroCap as to whether the parties' agreement was, in fact, a true factoring agreement or whether it was merely a disguised security agreement. The Court does not believe that it is necessary to decide this issue at this time and, for purposes of this Opinion, shall refer to EnviroCap's alleged interest as a security interest.

proceeds.  In addition, each of the defendants claims a perfected lien against the debtor's

contractual rights and general intangibles which give rise to these proceeds.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits, show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law.  Fed. R. Bankr. P. 7056(c)(2).

After reviewing all of the motions for summary judgment, it appears the parties' motions raise

two primary issues: (1) what are the debtor's property rights; and (2) what interest, if any, do the

defendants have in those property rights.

The defendants each claim, at the very least, a perfected security interest in certain

collateral, including the debtor's accounts receivable, rights to payment, contract rights and

general intangibles.  They maintain that this collateral encompasses any rights to payment that

the plaintiffs may have for work performed under its Contract for Services and Amended

Payment Agreement, including any funds ultimately paid from the Illinois LUST Fund. For its

part and in objection to the defendants' motions, USI seeks a declaration that the defendants'

purported liens on the LUST Fund proceeds are either invalid or non-existent for a number of

reasons, including that the liens are void as against public policy (Counts I and II), that the liens

were not properly perfected (Counts III and IV), and that the defendants' interest in certain

"Stage I" LUST Fund claims had no value as of the petition date (Count V).  The Court shall

address each count of the plaintiff's complaint in turn.

## Counts I and II—Public Policy Arguments

4

Counts I and II each seek a declaration that the defendants' interests in the LUST Fund claims are void as against public policy.  In Count I, USI argues that because § 5/ 57.8a of the Illinois Environmental Protection Act contemplates assignment of only those claims which have been approved by the IEPA (i.e. Stage III claims), the State has evidenced a "public policy" against assignment of reimbursement rights in Stage I and II claims, and therefore, any interests in such claims by the defendants are unenforceable.  *See* Second Amended Complaint, Count I, ¶¶ 29-30.

Similarly, in Count II, the plaintiff argues that the defendants' claims as to *all* reimbursements from the LUST Fund, regardless of stage, are unenforceable because none of the assignments to the defendants were "made and recorded in the fashion § 5/57.8a requires."  *See* Second Amended Complaint, Count II, ¶ 32.

Prior to 2007, there was no statutory authority for direct assignment of LUST Fund proceeds.  However, in 2007, in order to encourage environmental remediation and to help offset the effect of delays in State payments, the legislature passed § 5/57.8a of the Illinois Environmental Protection Act.  It states, in pertinent part:

(a)  If the agency has formed a priority list for payment. . . an owner or operator on the priority list may assign to any bank, financial institution, lender, or other person that provides factoring or financing to an owner or operator or to a consultant of an owner or operator a full approved payment amount on the priority list for which the owner or operator is awaiting payment.  The assignment must be made on an approved payment-by-payment basis and must be made on forms prescribed by the Agency . . . .

* * *

(c) An owner's or operator's assignment under this Section is irrevocable and may be made to only one assignee.  The State shall pay the assigned amount, subject to the right of the State Comptroller to make the deductions and off-sets provided in Section 10.05 of the State Comptroller Act, to this one assignee only and shall and shall not pay the assigned amount to any subsequent assignee of the one assignee.

5

415 ILCS 5/57.8a (2007).

There are no reported cases interpreting §5/57.8a and the legislative history is scant. However, the Court believes that the situation presented by this case is analogous to that in *J. Catton Farms*, *Inc.*, 779 F.2d 1242 (7th Cir. 1985). In *Catton*, the debtor obtained loans from the First National Bank of Chicago secured by, among other things, the debtor's receivables and accounts. The debtor then entered into a payment in kind or "PIK" contract with the United States Department of Agriculture under which, in exchange for not growing crops, debtor was to receive payment in kind (i.e. crops). Shortly thereafter, the debtor filed a petition under Chapter 11. It then assigned the proceeds of its PIK contract to Cargill in exchange for more than $200,000.00. When the PIK contract proceeds (i.e. corn) were ultimately delivered, they were delivered to Cargill as assignee under the contract. The Bank brought suit to recover the value of the PIK contract proceeds. Both the Bankruptcy Court and the District Court found that the Bank had a secured interest in the proceeds of the debtor's contract with the U.S.D.A. and the debtor appealed.

The debtor maintained that the Bank could not enforce its lien because its assignment had neither been made on the requisite USDA form nor filed with the county agricultural committee as required by the PIK program regulations. In rejecting the debtor's argument, the Seventh Circuit found that the regulations relied upon by the debtor were "merely to . . . protect the Department of Agriculture from liability for paying over the proceeds of a 'PIK' contract to an unauthorized payee." *Id.* at 1245. The Court further noted that "[t]he suggestion that the regulation goes further and requires any secured creditor to file evidence of his security interest

6

with the Department's representatives on pain of forfeiting his lien is pretty far-fetched." *Id*. at 1246.

After reviewing the statute and relevant authority, the Court does not believe that the State, by recognizing assignments only as to IEPA approved claims, was attempting to advance any type of public policy against collateral pledges of claims in other stages of completion or against a general pledge of the right to payments received by the debtor and perfected under the Uniform Commercial Code. Rather, the Court believes that the State was merely attempting to limit its liability and administrative responsibility by restricting assignments to only those claims which it had already approved. It would be very difficult for the State to process assignment forms on claims which have not yet been submitted to the IEPA for review (i.e. Stage I claims). Not only would this increase the State's administrative expenses, but it would also increase the likelihood that the State could pay the Fund proceeds to the wrong party, thus exposing the State to greater liability. The State would not want to be the arbiter of lien priority issues on receivables pledged to more than one lender.

This conclusion is supported by the language of § 5/57.8a(c) itself. The statute provides that an *owner or operator* may make only one irrevocable assignment of their LUST Fund payment right and that the State "shall not pay the assigned amount to any subsequent assignee of the one assigned." Nothing in this section prohibits subsequent assignments by the initial assignee. The statute merely states that an owner or operator may make only one assignment and that the State of Illinois will not make payments to any subsequent assignees. This does not mean that subsequent assignees cannot exist; it simply means that the State of Illinois will not pay them directly.

Further, as in *Catton*, the Court does not believe it was necessary for the defendants in this case to have completed IEPA assignment forms in order to protect their liens.  None of the defendants are claiming direct assignments from an owner-operator, nor are any of the defendants seeking to be reimbursed directly from the LUST Fund.  Hence, the Court finds that the restrictions of § 5/57.8a are inapplicable to these defendants

Finally, after analyzing § 5/57.8a within the context of the Environmental Protection Act as a whole, the Court believes that the main policy behind this legislation was to encourage financing of environmental remediation.  Due to environmental and safety concerns, the State of Illinois obviously has a strong interest in ensuring that leaking underground storage tank sites are remediated as quickly as possible.  However, as the plaintiff itself has acknowledged, funding is a problem faced by a number of owners and operators, many of whom would be unable to remediate their contaminated sites without financial assistance.  If assignments of LUST Fund proceeds were not valid until Stage III, lenders would be unwilling to finance the work needed in order to even *reach* Stage III.   To adopt debtor's argument would defeat the State's policy of encouraging environmental remediation as there would be no funds with which to finance the work.  Accordingly, the Court rejects the debtor's position and finds that § 5/57.8a does not prohibit collateral pledges of LUST Fund proceeds.

<u>**Count II**</u>– <u>**Preferences and Post-Petition Payments**</u>

In addition to its public policy arguments, USI  also asserts in Count II that certain transfers by the debtor to the defendants are subject to avoidance pursuant to 11 U.S.C. §§ 547(b) and 549.

Section 547(b) of the Bankruptcy Code allows a trustee or debtor-in-possession to avoid

a transfer of an interest of the debtor in property, (1) to or for the benefit of a creditor; (2) on or account of an antecedent debt, (3) made while the debtor was insolvent; (4) within 90 days of the petition date, (5) which enables the creditor to receive more than it would in Chapter 7, had the transfer not been made, and such creditor received payment of such debt to the extent provided under the Bankruptcy Code.  11 U.S.C. § 547(b).   In order to successfully avoid a transfer as a preference, the trustee or debtor- in-possession must prove each of the enumerated elements. *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir 1988); *Waldschmidt v. Ranier (In re Fulghum Constr. Corp*.), 706 F.2d 171, 172 (6th Cir. 1983).

The parties have stipulated that within 90 days prior to the filing of the debtor's bankruptcy petition, each of the defendants received disbursements from the LUST Fund relating to USI receivables and that said payments were on account of the defendants' pre-petition loans with the debtor.  *Amended Joint Stipulation* ¶ 11.  Further, for purposes of this section, the Bankruptcy Code presumes that a debtor is insolvent during the 90-day period immediately preceding the filing of the petition. 11 U.S.C. § 547(d).   Thus, the issue becomes whether the transfers enabled these defendants to receive more than others of its class pursuant to § 547(b)(5).

Section 547(b)(5) "simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-à-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the case.'"  *Hagar v. Gibson (In re Hagar)*, 109 F.3d 201, 210 (4th Cir. 1997) (*quoting Smith v. Creative Fin. Mgmt., Inc. (In re Virginia-Carolina Fin. Corp*), 954 F.2d 193, 198-199 (4th Cir. 1992)).  Generally, payments to

9

fully secured creditors are not considered preferential transfers because these creditors would not receive more from the transfer than they would have received in Chapter 7 liquidation.  5 COLLIER ON BANKRUPTCY, ¶ 547.03[7] (16th rev. ed. 2010).  As explained in greater detail below, the Court believes that the defendants in this case hold valid and enforceable liens against the LUST Fund proceeds and are secured creditors. The transfers in question would not have enabled the defendants to receive more than they would have otherwise received in a Chapter 7 and, accordingly, plaintiff's attempt to avoid defendants' liens as preferences pursuant to § 547 must fail.

Plaintiff also contends that certain post-petition transfers to the defendants are avoidable pursuant to 11 U.S.C. § 549.  That section permits a trustee or debtor-in-possession to avoid post-petition transfers of estate property which have not been authorized by the Court or the Bankruptcy Code.  It is undisputed that each of the defendants received post-petition adequate protection payments from the bankruptcy estate.  However, these payments *were* authorized by the Court pursuant to an Order entered January 27, 2010[4] and, therefore, are not subject to avoidance pursuant to §549.  *See In re EDG Holdings, Inc.*, 09-41525, Docs. #231 and #232.

It should be noted that even if the post-petition payments in this case had not been authorized by the Court, they still would not be avoidable under § 549.  As explained in COLLIER ON BANKRUPTCY:

> On occasion a debtor may transfer property of the estate that is subject to an unavoidable prepetition security interest to the holder of the secured claim.  While such transfers technically may be avoided under section 549, the courts take a pragmatic view and elect not to avoid the transfer because avoidance would not

---

[4] The parties' stipulation and the Court's Order regarding these payments specifically provided that the payments were subject to the Court's determination in this adversary as to the validity of the defendants' liens.  As the Court finds that the defendants are secured creditors, this limitation is of no import.

benefit the estate.  Underlying these holdings is the assumption that the property
to be recovered would still be subject to the security interest and would have to be
returned to the secured creditor in any event.

5 COLLIER ON BANKRUPTCY ¶ 549.04[4] (16th rev. ed. 2010) *citing Schnittjer v. Burke Constr.*

*Co.* (*In re Drahn*), 405 B.R. 470 (Bankr. N.D. Iowa 2009); *Weiss v.  People Savings Bank* (*In re*

*Three Partners, Inc.*), 199 B.R. 230 (Bankr. D. Mass. 1995).  *See also EEE Commercial Corp.*

*v. Holmes* (*In re ASI Reactivation, Inc.*), 934 F.2d 1315, 1321 (4th Cir. 1991); *Dave Noake, Inc.*

*v. Harold's Garage, Inc.,* (*In re Dave Noake, Inc.*), 45 B.R. 555, 557 (Bankr. D. Vt. 1984).  For

these reasons, the Court finds that the post-petition adequate protection payments to the

defendants did not violate § 549 and are not subject to avoidance.

### Counts III and IV—Property Rights and Perfection

Counts III seeks a declaratory judgment that the defendant lenders are not entitled to

perfected secured-party status with respect to Stage I and II claims because this property "did not

exist" on the date of the bankruptcy.  Similarly, Count IV seeks declaratory and related relief as

to Stage I and II claims on the "related and distinguishable" ground that the security interest had

not *attached* by the petition date.

 Article 9 of the Illinois Uniform Commercial Code governs secured transactions and the

creation of security interests.  Pursuant to § 5/9-203, in order to create an enforceable security

interest (i.e. an interest which has "attached" to the collateral), several requirements must be met:

 (1) the creditor must give value; (2) there must be an authenticated security agreement which

provides a description of the collateral; and (3) the debtor must have rights in the collateral or the

power to transfer rights in the collateral to a third party. 810 ILCS 5/9-203; WHITE & SUMMER'S

UNIFORM COMMERCIAL CODE § 31-2.   Pursuant to §5/9-308  "a security interest is perfected if

it has attached and all of the applicable requirements for perfection . . . have been satisfied. . . ." 810 ILCS 5/9-308(a).  This includes the filing of a financing statement as required by § 5/9-310.

It is undisputed that the first two requirements of § 9-203 have been satisfied– the defendants gave value to the debtor in the form of loan proceeds and the debtor authenticated security agreements in favor of the defendants that provide descriptions of the collateral.  It is also undisputed that each of the defendants filed UCC-1 financing statements in connection with their security agreements.  The issue is whether the plaintiff, at the time that the petition was filed, had any property rights in which the defendants may claim a security interest.

Plaintiff argues that it had no LUST Fund payment rights in Stage I and Stage II claims at the time that the bankruptcy petition was filed because neither the performance of work under the remediation contracts nor the invoicing of customers creates a State payment obligation. It reasons that the security interests assigned to the defendants respecting those claims were assignments of "possibilities, contingent interests, and property that did not exist" and, therefore, the defendants' liens did not attach. The Court disagrees.

The defendants in this case took security interests in many forms of collateral, including debtor's accounts, accounts receivable, rights to payment, contract rights, general intangibles, and proceeds.[5]   As explained above, this Court does not believe that § 5/57.8a of the Environmental Protection Act supersedes the provisions of the Uniform Commercial Code regarding secured transactions.  Simply because the IEPA does not accept assignment forms or

---

[5] Under the Uniform Commercial Code, "accounts" are defined as "a *right to payment* of a monetary obligation, whether or not earned by performance. . . (ii) *for services rendered or to be rendered*."  810 ILCS 5/9-102(a)(2) (emphasis added).  Similarly, "proceeds" include "whatever is collected on, or distributed on account of collateral; [and] rights arising out of collateral."  810 ILCS 5/9-102(a)(64)(B) and (C).  "General intangibles" are any personal property, other than accounts, and includes documents,

12

make disbursements from the Fund until a claim is approved does not mean that the debtor does not have a right to be eventually paid for the work that it performed pursuant to its Contract for Services and Amended Payment Agreement. The debtor's contracts and the work that it performed under those contracts have value. That is what the defendants financed here—the *value* generated by the debtor's business.

Throughout its complaint, the plaintiff appears to confuse the collateral with the source of payment. The LUST Fund proceeds, in and of themselves, are not the only collateral in this case. Rather, it is these monies *and what they represent*— i.e. contractual payment rights for work performed on contaminated property sites—which comprise the defendants' collateral. Admittedly, claims in what USI refers to as Stages I and II are contingent and not yet ready for payment by the IEPA. However, USI's rights in the collateral and its ability to assign those rights are not eliminated simply because the ultimate "right to payment" from the LUST Fund is uncertain or because an assignment was not made in accordance with § 5/57-8a. The essential point here is that what the debtor labeled as Stage I, II and III receivables all really describe the same thing– *the debtor's right to payment*. These rights are recognized under the U.C.C. as, among other things, "accounts receivable," "general intangibles," and "payment intangibles" which are acceptable forms of collateral to which a properly granted and perfected lien can attach. The LUST Fund assignment provision simply allowed the State to pay a lender directly. It did not deem a lender's security interest unperfected in funds to be paid directly by the customer or State to the debtor.

Based on the foregoing, the Court determines that all of the requirements of § 5/9-203 of

---

instruments, money and payment intangibles. 810 ILCS 5/9-102(a)(42).

the Uniform Commercial Code have been satisfied and that defendants have perfected their

interests by filing UCC-1 financing statements.  Accordingly, the defendants have valid,

enforceable liens on all of the debtor's rights to payment, including those characterized as Stage

I and Stage II receivables.

### Count V—Value of "Stage I" Claims

In Count V, the plaintiff attempts to argue that the defendants' interests in "Stage I"

receivables are devoid of value because (1) the property "did not exist" as of the date of filing

and (2)  neither USI nor the defendants could make claims against the IEPA or USI's customers

for payment on these claims. The Court has already established that "Stage I" receivables are

part of a greater bundle of rights comprising the defendants' collateral which *did* have value as

of the date of filing.  The Court further notes that the plaintiff's arguments on this point appear

disingenuous, as its own Schedule B estimates that Stage I claims had a value of $3,008,165.29

as of the petition date. *See In re United Science Industries, Inc.*, BK 09-41563, Doc. #61.[6]

Accordingly, the Court rejects the plaintiff's argument in this regard.

For the reasons set forth above, the Court finds that the plaintiff has a property interest in

the LUST Fund proceeds and that the defendants, by virtue of their authenticated security

agreements and properly filed UCC-1 financing statements, hold valid, enforceable and perfected

security interests in that property.  Accordingly, the defendants are entitled to judgment as a

---

[6] As further evidence of the value of these early stage claims, Bryan Williams, who has been appointed the Responsible Person in the underlying bankruptcy, is presently in the process of assigning and/or selling a number of the debtor's contracts, some of which are in the very early stages of remediation. He has received a number of bids on these contracts from other environmental remediators who are seeking the right to complete the outstanding contracts. As a condition of assignment, the winning bidders must agree to take all steps necessary to collect receivables associated with their contract.  In exchange, the remediator will receive a "collection fee," which is to be based on a percentage of the LUST Fund proceeds ultimately received on the contract.  *See In re EDG Holdings, Inc*, BK 09-41525, Docs. #279

matter of law and the Court grants summary judgment in favor of the defendants and against the

plaintiff on each count of the complaint.  A separate order and judgment shall enter.

ENTERED: August 3, 2010

/s/ Laura K. Grandy
UNITED STATES BANKRUPTCY JUDGE

and #388.